UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

BROCK SERVICES, LLC                         CIVIL ACTION

VERSUS                                      NO. 18-867-JWD-EWD

RICHARD ROGILLIO, ET AL.

RULING AND ORDER

This matter is before the Court on Kristy Bauer's Motion to Compel Arbitration and to Dismiss (Doc. 219); Rhonda Redd's Motion to Compel Arbitration and to Dismiss (Doc. 220); Ken Rodgers' Motion to Compel Arbitration and to Dismiss (Doc. 221); Gene Gatlin's Motion to Compel Arbitration and to Dismiss (Doc. 223); Ricky Rogillio's Motion to Compel Arbitration and to Dismiss (Doc. 224) (together the "Individual Defendants' Motions to Compel"); and Apache's Motion to Compel Arbitration and to Dismiss, or Alternatively, Motion to Stay Proceedings Pending Completion of Arbitration (Doc. 249) ("Apache's Motion to Compel"). Brock opposes Individual Defendants' Motions to Compel (Doc. 256) and Apache's Motion to Compel (Doc. 260). Individual Defendants and Apache filed replies. (Docs. 263 and 268.) Brock filed a sur-reply responding to Individual Defendants. (Doc. 267.) Oral argument is not necessary. Having considered the arguments raised by the parties, the relevant facts, the law and for the reasons explained below, the Court will grant Individual Defendants' Motions to Compel Arbitration and Apache's Motion to Compel Arbitration. [1]

I.       RELEVANT FACTS AND PROCEDURAL HISTORY

---

[1] While this matter was pending, Brock filed a *Motion for Preliminary Injunction* (Doc. 297) against Apache alleging that they continue to use protected trade secrets. The parties provided briefing on whether the issues involved in the *Motion for Preliminary Injunction* fall under the arbitration agreement. (Docs. 310 and 311.) The Court finds that the issues raised in the *Motion for Preliminary Injunction*, including the alleged ongoing use of trade secrets by Apache falls within the scope of the Dispute Resolution Policy and is therefore arbitrable.

1

*a. Allegations in the complaints*

Brock is a provider of industrial maintenance services, including complex scaffolding work, and asbestos abatement. (Doc. 192 at ¶ 12.) In order to develop customer relationships, Brock researches customer needs and develops marketing plans, pricing structures, and produces other confidential information that is crucial to success in a competitive market. (Doc. 192 at ¶ 13.) Brock's Information Technology policy restricts access to their confidential information. (*Id.* at ¶ 14.) Apache Industrial Group, Inc. ("Apache") is Brock's competitor and operates in Louisiana.

This case arose out an employment dispute when Brock filed a complaint against Richard Rogillio, its former Vice President of Operations, to enforce a non-competition agreement. (Doc. 1.) On October 12, 2018, Brock filed its first Amended Complaint naming Kristy Bauer, Rhonda Redd, and Gene Gatlin as well as Apache as additional defendants and alleging new claims under the Computer Fraud and Abuse Act, the Defend Trade Secrets Act, the Louisiana Uniform Trade Secrets Act. (Doc. 4.) On January 15, 2019, Brock filed its Second Amended Complaint, naming as an additional defendant Ken Rogers; together, Mr. Rogillio, Ms. Bauer, Ms. Redd, Mr. Gatlin, and Mr. Rogers will be referred to as the "Individual Defendants". (Doc. 57.) In the Second Amended Complaint, Brock alleged additional claims under the Louisiana Unfair Trade Practice Act as well as claims for breach of fiduciary duty, civil conspiracy and unjust enrichment. (Doc. 57 at 1.) On July 18, 2019, Brock filed a Third Amended Complaint against Individual Defendants and Apache under the same causes of action.

Brock alleges that Individual Defendants resigned from Brock within weeks of each other and began working at Apache. (Doc. 192 at 1.) When Mr. Rogillio resigned on September 3, 2018, he deleted thousands of files from his work computer and terminated employees to make them employable by Apache. (*Id.*) In this manner, Mr. Rogillio recruited Ms. Bauer, Ms. Redd,

Mr. Gatlin, and Mr. Rogers to work at Apache. (*Id.* at 2.) Ms. Bauer, Ms. Redd, Mr. Gatlin and Mr. Rogers also deleted files from their work computers. Ms. Bauer, Ms. Redd, and Mr. Rogers misappropriated trade secrets and other confidential information by placing confidential documents on USB storage devices and brought those devices to their employment with Apache. (*Id.*) In addition Mr. Gatlin sabotaged one of Brock's customer relationships. (*Id.*)

Brock likewise alleges that Apache knew that Individual Defendants acquired the misappropriated trade secrets by improper means and continues to use the confidential and proprietary information to benefit Apache. (Doc. 192 at 31.) As such, Apache allegedly "aided, abetted, and encouraged the unlawful competition with the specific intent of harming Brock and depriving Brock of its customers and competitive advantage." (Doc. 192 at ¶ 153.) "Thus, Apache conspired with Employee Defendants . . . to unlawfully compete against Brock and transfer Brock's business to Apache." (*Id.* at 154.)

b. *Brock's Employee Handbook and Dispute Resolution Policy*

General Counsel for Brock provided an affidavit in a separate action that states that it is company policy that a condition of employment is that an employee must sign both Brock's Employee Manual and a separate document detailing its dispute resolution policy, which contains a mutually binding arbitration agreement ("Dispute Resolution Policy"). (Doc. 220-6, Affidavit of Krystal Hunter, *Carl Lee v. Brock Services*, filed 1/31/2018, Case No. 1:17-cv-00272-LG-RHW (S.D. Miss)).) Brock has produced partial copies of Mr. Rogillio, Ms. Redd, and Mr. Gatlins' personnel files, including a Dispute Resolution Policy signed by each employee in 2010. (Doc. 263-1 at 3-4; Doc. 263-1 at 7-8; Doc. 263-1 at 11-12.) A signed Dispute Resolution Policy has not been produced for Ms. Bauer or Mr. Rogers. (Doc. 263-1 at 13, 17.)

Although Brock's Employee Handbook does not contain the Dispute Resolution Policy, it references the Dispute Resolution Policy in two sections: Section 8.1 – Employee Grievances and Section 8.2 – Dispute Resolution Policy. Section 8.1 – Employee Grievances (2008)[2] states:

8.1 - EMPLOYEE GRIEVANCES

It is the policy of the Company that all employees have the right to voice their complaints.

Should a condition exist, which an employee feels is unsatisfactory, it is important that s/he bring it to the attention of the appropriate person in the appropriate manner. Normally that person is the employee's immediate supervisor. If the supervisor is the source of the complaint, the employee is to contact the next higher level of management or Human Resources.

If the employee feels the problem remains unresolved following discussions with the supervisor, the employee may submit the complaint in writing for reconsideration. A written complaint is to be submitted to the Site Manager or Office Manager, or Human Resources. In certain cases, the manager, supervisor and employee may wish to meet to provide a fuller explanation of the situation and

---

[2] The 2016 Employee Handbook attached to the first Amended Complaint states:

8.1 EMPLOYEE GRIEVANCES

It is the policy of the Company that all employees have the right to voice their complaints.

Should a condition exist which an employee feels is unsatisfactory, it is important that he bring it to the attention of the appropriate person in the appropriate manner. Normally that person is the employee's immediate supervisor. If the supervisor is the source of the complaint, the employee is to contact the next higher level of management or Human Resources, or the Company's AlertLine.

If the employee feels the problem remains unresolved following discussions with the supervisor, the employee may submit the complaint in writing for reconsideration. A written complaint is to be submitted to the Site Manager/Office Manager or Human Resources. In certain cases, the manager, supervisor and employee may wish to meet to provide a fuller explanation of the situation and the action taken. Normally, all complaints will be resolved by this step of the grievance procedure.

An employee who feels the complaint has not received adequate attention after management review may direct the written complaint to the corporate Human Resources Department. The Human Resources Department will review the complaint and the steps already taken.

If an employee is still dissatisfied with the Company response to the situation, the employee may then arrange for an independent arbitration/mediation as outlined in the Dispute Resolution Policy. An employee will not be penalized for presenting a good-faith complaint to the supervisor or to members of management.

See the Compliance Hotline / Brock AlertLine policy for more information about how to make an anonymous complaint or make the initial complaint with someone other than your immediate manager.

(Doc. 4-3 at 75.) There are no notable differences between the two versions of Section 8.1.

the action taken. Normally, all complaints will be resolved by this step of the grievance procedure.

An employee who feels the complaint has not received adequate attention after management review may direct the written complaint to the corporate Human Resources Department. The Human Resources Department will review the complaint and the steps already taken.

If an employee is still dissatisfied with the Company response to the situation, the employee may then arrange for an independent arbitration/mediation as outlined in the Dispute Resolution Policy. An employee will not be penalized for presenting a good-faith complaint to the supervisor or to members of management.

(Doc. 267-1 at 59.) Section 8.2 – Dispute Resolution Policy (2008)[3] states:

8.2 - DISPUTE RESOLUTION POLICY

All employees of the Company shall be subject to the Company's Dispute Resolution Policy set forth on the following page for resolution of all matters relating to the employee's employment with the Company. This Dispute Resolution Policy shall be mutually binding on the Company and the employee and is a distinct and separate agreement from all other modifiable Company policy provisions. The employee acknowledges that the terms and conditions of the Dispute Resolution Policy has been provided to employee as a separate document either through notice or as part of the employee's hiring package. In addition, the employee may request a copy of this policy at any time by contacting the Human Resources Department.

The Dispute Resolution Policy is a binding agreement and acceptance and/or continuation of employment with the Company constitutes knowing and voluntary acceptance and agreement to the terms and condition of the Dispute Resolution

---

[3] The 2016 Employee Handbook attached to the first Amended Complaint states:
8.2 – DISPUTE RESOLUTION POLICY

All employees of the Company shall be subject to the Company's Dispute Resolution Policy for resolution of all matters relating to the employee's employment with the Company. This Dispute Resolution Policy shall be mutually binding on the Company and the employee and is a distinct and separate agreement from all other modifiable Company policy provisions. The employee acknowledges that the terms and conditions of the Dispute Resolution Policy has been provided to the employee as a separate document either through notice or as part of the employee's hiring package. In addition, the employee may request a copy of this policy at any time by contacting the Human Resources Department.

The Dispute Resolution Policy is a binding agreement and acceptance and/or continuation of employment with the Company constitutes knowing and voluntary acceptance and agreement to the terms and condition of the Dispute Resolution Policy. The Company hereby advises the employee to consult with legal counsel regarding the consequences of the Company's Dispute Resolution Policy. The Dispute Resolution Policy does not in any way alter the "at-will" status of the employment relationship.

(Doc. 4-3 at 76.) The notable difference between these two versions is the absence of the phrase "set forth on the following page."

Policy. The Company hereby advises the employee to consult with legal counsel regarding the consequences of the Company's Dispute Resolution Policy. The Dispute Resolution Policy does not in any way alter the "at will" status of the employment relationship.

(Doc. 267-1 at 60.)

The Dispute Resolution Policy states:

1. This Dispute Resolution Policy, effective as of October 15, 2008, creates a mutual obligation to arbitrate between Brock Holdings I, LLC, its affiliates, subsidiaries and parent (the "Brock Group"1), and all employees of The Brock Group (collectively, The Brock Group and employees of The Brock Group are herein referred to as the "Parties"), and is for the express benefit of all other persons or entities included in the definition of the term "Company" and "Company's Customer" (as both terms are hereinafter defined). Each, every, any and all claims, disputes and/or controversies now existing or later arising between or among the Parties, or between or among the employees of The Brock Group and any other person or entity constituting the Company or a Company Customer, whether now known or unknown, arising out of or related to employment or termination of employment with The Brock Group shall be resolved only through final and binding arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and not by way of court or jury trial. *Such claims, disputes, and/or controversies, without limitation, include those arising out of or relating to: all issues of arbitrability, including but not limited to unconscionability and all grounds as may exist at law or in equity for the revocation of any contract, the interpretation or application of this Dispute Resolution Policy, employment application process, employment relationship, the Company's Customers, all property upon which, and/or with which the employee has or may perform any work or services for or on behalf of any person, trade secrets, unfair competition, compensation, breaks and rest periods, termination, or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, and federal, state, or other statutes and/or ordinances, if any, addressing the same or similar subject matters, and all other federal, state, or other statutory and common law claims including retaliation claims (but excluding other workers' compensation and unemployment insurance claims).* Nothing in this Dispute Resolution Policy shall be deemed to preclude a party from filing or maintaining a charge with the Equal Employment Opportunity Commission or National Labor Relations Board or bringing an administrative claim before any agency in order to fulfill the party's obligation to exhaust administrative remedies before making a claim in arbitration.

2. The Parties agree that they have engaged in transactions that affect interstate commerce.

6

3. All Disputes shall be exclusively resolved by final and binding arbitration exclusively conducted under the JAMS Employment Arbitration Rules and Procedures (the "Arbitration Rules") in effect at the time of the arbitration demand; provided however, any party may require, by written notice, that nonbinding mediation be conducted in parallel with the arbitration demand process. At any time, a copy of such Arbitration Rules is available upon written request to the HR Department of The Brock Group. All Disputes shall be administered by JAMS and conducted before one (1) JAMS Arbitrator. A demand for arbitration must be in writing and delivered by hand or first class mail to the other party within the applicable statute of limitations period. Any demand for arbitration made to The Brock Group shall be provided to the Company's legal department at its corporate office. The Arbitrator shall resolve all disputes regarding the timeliness or propriety of the demand for arbitration. The parties agree that in the event the arbitration services of JAMS are not available, an alternative neutral provider of substantially similar services mutually agreed to by the parties may be utilized.

4. *In arbitration, the parties will have the right to conduct civil discovery and bring motions, as provided by the Arbitration Rules.* However, there will be no right or authority for any dispute to be brought, heard or arbitrated as a class or collective action, or in a representative or private attorney general capacity on behalf of a class of persons or the general public. It is an indispensable condition of the arbitration that there will be no class arbitration.

5. Each party will pay the fees for his, her or its own attorneys, subject to any remedies to which that party may later be entitled under applicable law. If an employee brings a claim, dispute, or controversy subject to this Dispute Resolution Policy, the employee bears the responsibility for JAMS's initial filing or case management fee. All other fees associated with the arbitrator or arbitral forum shall be paid for by a company in The Brock Group, if it is a party to the arbitration, or by the applicable person(s) or entity (ies) constituting the Company or Company's Customer that is otherwise a party to the arbitration, if no company in The Brock Group is a party to the arbitration.

6. The Arbitrator may award any party any remedy to which that party is entitled under applicable law, but such remedies shall be limited to those that would be available to a party in a court of law for the claims presented to and decided by the Arbitrator. The Arbitrator will issue a decision or award in writing, stating the essential findings of fact and conclusions of law. The arbitration shall be confidential, and, except as may be required by law, neither a party nor an Arbitrator may disclose the existence, content, or results of any arbitration hereunder without the prior written consent of both parties. A court of competent jurisdiction shall have the authority to enter a judgment upon the award made pursuant to the arbitration.

7. In the event any provision of this Dispute Resolution Policy is determined by a court of competent jurisdiction to be illegal, invalid or unenforceable, the legality,

validity and enforceability of the remaining provisions shall not be affected thereby, except that in no circumstance shall there be class arbitration.

8. **The Brock Group hereby advises you in writing to consult with legal counsel regarding the legal consequences of this Dispute Resolution Policy. By accepting or continuing employment with The Brock Group, you acknowledge that you knowingly and voluntarily accept this Dispute Resolution Policy.**

9. This Dispute Resolution Policy is a mutually binding agreement between The Brock Group and all employees. It is distinct, separate and different from any other modifiable company policy provision. The Dispute Resolution Policy may not be changed or modified by The Brock Group, except with the acceptance of the employee after 60 days notice.

10. The term "Company" means The Brock Group and all related entities, including all officers, directors, employees, agents, subcontractors, vendors, shareholders, partners, insurers, benefit plans, benefit plan sponsors, fiduciaries, administrators, attorneys or affiliates of any company within The Brock Group, and their respective representatives, successors and assigns. The term "Company's Customer" means every customer of the Company, client of the Company, and any legal person or entity with whom, on the premises of whom, or with any property of whom this Company is or has been engaged in any business or provided any service, including, but not limited to, each, every, any and/or all parents, subsidiaries, co-employers, related entities, and/or all of the officers, directors, employees, agents, subcontractors, vendors, shareholders, partners, insurers, benefit plans, benefit plan sponsors, fiduciaries, administrators, or affiliates of any of the above, and their respective representatives, attorneys, successors and assigns. *For avoidance of doubt, each of the persons or entities listed in the definitions of "Company" and "Company's Customer" is expressly intended to be third party beneficiaries of this Dispute Resolution Policy and may enforce the Dispute Resolution Policy against an employee for any claims, disputes, or controversies by or against them by an employee.*

(Doc. 267-1 at 61-63 (italic emphasis added, bold and underline in original).)

c. *Disclosure of the Employee Handbook and the Dispute Resolution Policy during this litigation*

When Brock filed its first Amended Complaint on October 12, 2018, it attached a copy of

the 2016 Employee Handbook revised to omit the Dispute Resolution Policy. (Doc. 4-3 at 76.)

Brock's Second and Third Amended Complaints likewise only attached the 2016 Employee

Handbook (Doc. 57-3 and 192-3.) In responding to requests for production, Brock objected to

producing the personnel files for Individual Defendants, stating for example, regarding Ken

Rogers' personnel file:

> REQUEST FOR PRODUCTION NO. 25: Produce Brock's personnel file Concerning Ken Rogers.
>
> RESPONSE TO REQUEST NO. 25: Brock objects to the request to the extent is seeks information that is not relevant to the parties' claims and defenses or to Phase 1 discovery. Subject to and without waiving this objection, Brock will produce the entire personnel file or relevant portions thereof after a protective order is entered in the case.

(Doc. 220-11.)[4]

Individual Defendants state that they or their lawyers were not aware that the Dispute

Resolution Policy contained an arbitration agreement until that fact was disclosed during a Rule

37.1 Conference, when counsel for Individual Defendants requested a copy of the Dispute

Resolution Policy to which Brock's counsel responded, "Do you mean an arbitration

agreement?". (Doc. 263 at 10-11.) Individual Defendants were not aware of the Dispute

Resolution Policy until it was disclosed following the filing of the Motions to Compel

Arbitration. For example, Richard Rogillio, in his declaration to the Court, states:

> In connection with my employment with Brock, I signed many documents regarding my hiring, benefits, insurance, training, and numerous other employment-related matters. I may have signed, either directly or electronically,

---

[4] Brock also objected to producing the signed copy of the Employee Handbook and communications regarding the personnel file.

> REQUEST FOR PRODUCTION NO. 30: Produce Brock's Employee Handbook, together with Acknowledgement of Receipt of Employee Handbook signed by Ken Rogers.
> RESPONSE TO REQUEST NO. 30: Brock objects to the request because it seeks documents that are not relevant to Phase 1 discovery. Subject to and without waiving this objection, Brock is in the process of gathering documents and will produce responsive materials once a protective order is entered in the case. Brock further refers Rogers to documents attached to its complaints.
> REQUEST FOR PRODUCTION NO. 31: Produce all Documents and Communications Concerning Ken Rogers and Brock's Employee Handbook.
> RESPONSE TO REQUEST NO. 31: Brock objects to the request as overbroad, unduly burdensome, and because it seeks documents that are not relevant to Phase 1 discovery. Subject to and without waiving this objection, Brock is in the process of gathering documents and will produce responsive materials once a protective order is entered in the case. Brock further refers Rogers to documents attached to its complaints.

(Doc. 220-11.)

acknowledgements regarding Brock's Employee Handbook ('Handbook") and
Dispute Resolution Policy ("Agreement") from time-to-time, but I do not remember
what was signed and copies were not provided. When I terminated employment
with Brock, copies were not provided.

. . .

I understand that Brock's counsel first produced in this Action an Agreement
bearing my signature on Monday, November 4, 2019, at ll:45 a.m., shortly before
a telephone conference with the Court regarding stay of proceedings pending
decision regarding arbitration. A copy of the Agreement is attached to this
Declaration. I recognize my signature, but I have no recollection of having signed
this document on July 19, 2010, or of its contents, and I did not have a copy until
after provided by Brock's counsel on November 4, 2019.

(Doc. 263-1 at 1-2, Richard Rogillio Declaration; *see* Doc. 263-1 at 5-6, Rhonda Redd

Declaration; Doc. 263-1 at 9-10, Gene Gatlin Declaration; Doc. 263-1 at 13-14, Ken Rogers

Declaration (explaining that while a Dispute Resolution Policy was not disclosed by Brock, a

letter referencing a signed copy of the Dispute Resolution Policy was disclosed); Doc. 263-1 at

16-17, Kristy Bauer Declaration (explaining that Brock disclosed a signed copy of the Employee

Handbook but not a signed copy of the Dispute Resolution Policy).)

d.  *Judicial process in this case*

1.  Temporary Restraining Order/Preliminary Injunction

On October 25, 2018, soon after commencing this case, Brock sought a temporary

restraining order/preliminary injunction to enforce the non-competition portion of Mr. Rogillio's

employment contract. (Doc. 21.) In a settlement conference on November 7, 2018, with

Magistrate Judge Wilder-Doomes, the parties reached an agreement to resolve most of the issues

relating to the temporary restraining order/preliminary injunction, except for "the restrictive

covenants contained in Richard Rogillio's Employment and Non-Competition Agreement with

Brock Services, LLC." (Doc. 34.) Brock renewed its request for a preliminary injunction on

January 28, 2019. (Doc. 62.) After hearing testimony and oral argument, the Court entered a

Ruling and Order granting the request for a preliminary injunction and enjoining Mr. Rogillio

from performing or managing any work, including by phone, over the Internet, or in person in

the parishes restricted by Section 7.1 of the Employment Agreement until September 3, 2019.

(Doc 158 at 22.) Mr. Rogillio appealed the Court's Ruling and Order granting the preliminary

injunction and the Fifth Circuit affirmed the Court. (Doc. 213.)

    2.   <u>Forensic protocols and discovery disputes</u>

       Over the course of this litigation the parties have agreed to a stipulated forensic protocol

(Doc. 49-1), agreed to a joint protective order (Doc. 228), engaged in extensive discovery, and

participated in monthly in person status conferences with Judge Wilder-Doomes regarding issues

arising during discovery. (Doc. 275, Status Conference Report and Order from Dec. 17, 2019,

("The Court again reminded counsel of their professional responsibilities to work together to

resolve issues, especially since one party may be required to pay the other party's attorneys' fees.

To that end, the Court ordered the parties to have their respective client contacts attend the

January 21, 2020 status conference in person.")).)

    3.   <u>Motions to Dismiss and Answers by Individual Defendants and Apache</u>

       In response to the Second Amended Complaint, Individual Defendants filed a partial

motion to dismiss (Doc. 68), which the Court granted in part and denied in part. (Doc. 179.) The

Court dismissed with prejudice the Defend Trade Secrets Act and Louisiana Uniform Trade

Secrets Act claims against Mr. Rogillio and Mr. Gatlin. (Doc. 179 at 18.) The Court denied the

partial motion to dismiss regarding the other claims, including a misappropriation claim against

Apache, civil conspiracy, and unjust enrichment. (Doc. 179.)

       With the consent of Individual Defendants and Apache, the Court allowed Brock to file a

Third Amended Complaint that re-alleged the Defend Trade Secrets Act and Louisiana Uniform

Trade Secrets Act claims against Mr. Rogillio and Mr. Gatlin. (Doc. 192.) Mr. Rogillio and Mr.

Gatlin again filed a partial motion to dismiss, which the Court denied without prejudice to re-urging pending the outcome of the Motions to Compel Arbitration. (Doc. 197; Doc. 270.)

## II.    PARTIES' ARGUMENTS

*a.  Individual Defendants' arguments in support of Motions to Compel (Docs. 219, 220, 221, 223, and 224)[5]*

### 1.  The Federal Arbitration Act applies

Individual Defendants argue that the Federal Arbitration Act ("FAA") applies and this case cannot proceed in court. (Doc. 219-11 at 7.) Individual Defendants argue that the FAA states that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (Doc. 219-11 at 7 (citing 9 U.S.C. § 2).) In support, they cite *Dean Witter Reynolds, Inc. v. Byrd*, which states that for issues covered by an arbitration agreement, the FAA "mandates that district courts *shall* direct the parties to proceed to arbitration." (Doc. 219-11 at 7 (quoting *Dean Witter*, 470 U.S. 213, 218 (1985)).)

Individual Defendants suggest that the Court apply the Fifth Circuit's two part test in determining if arbitration is mandated: (1) whether the parties agreed to arbitrate the dispute, i.e. whether there is a valid arbitration agreement that the parties' dispute falls into; and (2) whether any federal law or policy renders the claim non-arbitrable. (Doc. 219-11 at 7 (citing *Will-Drill Res., Inc. v. Samson Res. Co.*, 352 F.3d 211, 214 (5th Cir. 2003)).) Applying the test, Individual Defendants argue, first, that the Employee Handbook provides that the Dispute Resolution Policy is a binding agreement that applies to Individual Defendants. (Doc. 219-11 at 7 (citing Employee Handbook, Doc. 219-1 at 3-4).)

---

[5] The Memorandums in Support of the Motion to Compel present identical law and argument sections. Therefore, this Ruling and Order cites only to one Memorandum in Support for the general arguments and will point out individual differences, if applicable.

Individual Defendants argue that although Brock has failed to produce a copy of the signed Dispute Resolution Agreement, broad scope of the policy and its applicability to all employees means that the Individual Defendants were bound by the arbitration agreement and it can be enforced. (Doc. 219-11 at 8.) Last, Individual Defendants argue that "there are no federal statutes or policies that would preclude arbitration of the claims and defenses at issue." (Doc. 219-11 at 8.)

*b. Brock Service's response*

1. <u>Individual Defendants waived the right to arbitrate</u>

In opposition, Brock argues that because this case has been heavily litigated for 397 days,[6] with five complaints, a court-supervised settlement of certain issues, two motions to dismiss, an answer, two injunction hearings, an appeal of a preliminary injunction, a complex scheduling order, and three forensic protocols, along with status conferences and discovery, Individual Defendants have waived arbitration by substantially invoking the judicial process. (Doc. 256 at 1-2.) As such, Brock urges the Court to deny the motions to compel arbitration as an unfair and inefficient attempt to re-litigate issues ruled on by this Court. (Doc. 256 at 2.)

Brock cites *Walker v. J.C. Bradford & Co.*, for the proposition that "The Fifth Circuit 'do[es] not look kindly upon parties who use federal courts to advance their causes and then seek to finish their suits in the alternate fora that they could have proceeded to immediately.'" (Doc. 256 at 4 (quoting *Walker v. J.C. Bradford & Co.*, 938 F.2d 575, 577 (5th Cir. 1991)).) Brock delineates that "a party waives its right to arbitrate when it 'substantially invokes the judicial process to the detriment or prejudice of the other party.'" (Doc. 265 at 5 (citing *Walker*, 938 F.2d

---

[6] At the time of the filing of the response.

at 577).) Brock details that waiver is a question of fact specific to the case. (Doc. 256 at 5 (citing *Tenneco Resins, Inc. v. Davy Int'l, AG*, 770 F.2d 416, 420 (5th Cir. 1985)).

>    A.    <u>Individual Defendants substantially invoked the judicial process</u>

Overall, Brock argues that Individual Defendants have waived the right to arbitrate "because (1) they substantially invoked the judicial process and (2) changing forums at this late stage would prejudice Brock." (Doc 256 at 5.)

Brock asserts that Individual Defendants substantially invoked the judicial process by fiercely defending this litigation over the course of a year without raising arbitration as an issue. Brock highlights the "extensive motion practice and discovery (which is governed, in part, by three forensic protocol orders and a complex scheduling order overseen by the Court) already completed by the parties" as evidence that Individual Defendants have substantially invoked the judicial process.

Brock cites numerous cases wherein courts, including the Fifth Circuit, have found that filing a substantive motion to dismiss and participating in discovery was sufficient to substantially invoke the judicial process. (Doc. 256 at 6-7 (citing, in part, *Forby v. One Techs., L.P.*, 909 F.3d 780, 785 (5th Cir. 2018) ("[w]hen a party fails to demand arbitration and engages in activity inconsistent with the intent to arbitrate, the party later opposing a motion to compel may more easily show that its position has been prejudiced."); *Janvey v. Alguire*, 847 F.3d 231, 243, n. 11 (5th Cir. 2017) (finding waiver where defendant participated in discovery and filed motion to dismiss); *Leal v. Sinclair Broad. Grp., Inc.*, No. 16-679, 2017 WL 1458810, at *4 (W.D. Tex. Apr. 25, 2017) ("By removing this case to Federal Court and filing a substantive motion to dismiss, Defendants demonstrated a clear and unmistakable 'disinclination' to arbitrate this case."); *Jallo v. Resurgent Capital Servs.*, LP, 131 F. Supp. 3d 609, 615-16 (E.D. Tex. 2015) ("Defendants, at the very least, substantially litigated this matter, filing much more than a

perfunctory motion to dismiss and attempting to halt discovery until a decision was rendered on the merits of the case.")).) Applying the waiver standard to this case, Brock argues that Individual Defendants substantially invoked the judicial process because they entered into a Court supervised settlement regarding the temporary restraining order and sought dismissal of the claims without raising arbitration. (Doc. 256 at 7.)

Brock points out that it is only when it filed the Fourth Amended Complaint with new allegations learned during discovery that Individual Defendants sought arbitration. (Doc. 256 at 7). Brock analogizes the filing of the Fourth Amended Complaint to an adverse ruling by a court, citing *Nicholas v. KBR, Inc.*, which states that the "belated decision seeking arbitration is particularly troubling given that it came on the heels of an adverse ruling." (Doc. 256 at 7 (quoting *Nicholas v. KBR, Inc.*, 565 F.3d 904, 909 (5th Cir. 2009)) (citing also *Hurley v. Deutsche Bank Tr. Co. Americas*, 610 F.3d 334, 339 (6th Cir. 2010); *St. Mary's Med. Ctr. of Evansville, Inc. v. Disco Alum. Prod. Co.*, 969 F.2d 585, 589 (7th Cir. 1992); *cf. BOSC, Inc. v. Bd. of Cty. Comm's of Cty. of Bernalillo*, 853 F.3d 1165, 1176 (10th Cir. 2017)). Therefore, Brock maintains that Individual Defendants have substantially invoked the judicial process.

### B. *Compelling arbitration would prejudice Brock*

Under the second prong, Brock argues that compelling arbitration would prejudice Brock because: (1) Individual Defendants can bypass rulings of the Court to re-seek dismissal of Brock's claims; (2) the settlement agreement, forensic protocols, and scheduling orders will have to be renegotiated in arbitration by the arbitrator; (3) further delay will increase damages to Brock due to the confidential information allegedly held by Apache and Individual Defendants; (4) Brock will face increased costs of litigation. (Doc. 256 at 8-9.) Therefore, Brock argues that the Court should find arbitration would prejudice Brock.

### 2. Brock is not to blame for Individual Defendants' delay in seeking arbitration

Brock argues that Individual Defendants cannot suggest their delay in seeking arbitration is due to Brock because Individual Defendants had actual knowledge of the arbitration agreements. (Doc. 256 at 9.) Brock asserts that the Individual Defendants had actual knowledge because: (1) Individual Defendants signed the arbitration agreements at issue; and (2) the Employee Handbook is part of the public record and it states in Section 8"[i]f an employee is still dissatisfied with the Company response to the situation, the employee may then arrange for an independent arbitration/mediation as outlined in the Dispute Resolution Policy." (Doc. 256 at 9.) Brock argues that even if this does not amount to actual knowledge, it amounts to constructive knowledge. (Doc. 256 at 9 (citing *Huntington Bank v. Merrill Lynch*, 77 F.3d 479 (5th Cir. 1996) (finding waiver after considering that "[t]he district court clearly found that Huntington was at least on constructive notice as to the existence of the arbitration agreements."). Brock likewise dismisses Individual Defendants' citation to other cases involving Brock, as only indicative of the fact that the party seeking arbitration has the burden to do so in a timely manner.

Therefore, Brock argues that because Individual Defendants had constructive, if not actual, knowledge of their arbitration rights, the Court should not excuse Individual Defendants' delay.

3. <u>Bauer and Rogers did not enter into arbitration agreements</u>

Brock asserts that Ms. Bauer and Mr. Rogers did not sign arbitration agreements and can only compel arbitration if the Court finds that the agreement applies to non-parties. (Doc. 256 at 10 (citing *Halliburton Energy Servs. v. Ironshore Specialty Ins. Co.*, 21 F.3d 522, 531 (5th Cir. 2019)).) Because Ms. Bauer and Mr. Rogers do not provide a basis to compel arbitration under any applicable principle of state law, Brock argues the Court should rule that Ms. Bauer and Mr.

Rogers did not have the right to arbitrate and, in addition, waived any rights they may have had. (Doc. 256 at 10-11.)

*c.  Individual Defendants' reply*

   1.  Defendants have not waived mandatory arbitration

      A.  *Waiver of arbitration rights must be knowing*

Individual Defendants argue that, not only does Brock misapply the standard for waiver of arbitration, but also that "waiver of arbitration is not a favored finding and there is a presumption against it." (Doc. 263 at 2 (citing *Lawrence v. Comprehensive Bus. Servs. Co.*, 833 F.2d 1159, 1164 (5th Cir. 1987); *see Subway Equipment Leasing v. Forte*, 169 F.3d 324, 326 (5th Cir. 1999) ("there is a strong presumption against waiver of arbitration.").) Individual Defendants argue that wavier of arbitration is fact specific to each case, with doubts resolved in favor of arbitration. (Doc. 263 at 2 (citing *Tenneco Resins*, 770 F.2d at 420).) Individual Defendants assert that waiver occurs when a party substantially invokes the judicial process to the detriment or prejudice of the other party. (Doc. 263 at 3 (citing *Walker*, 938 F.2d at 577-578).) Because Brock, not Individual Defendants, substantially invoked the judicial process and concealed the mandatory mutual arbitration agreement from Individual Defendants, they reason that Individual Defendants have not waived arbitration. (Doc. 263 at 3.)

Individual Defendants maintain that delay between filing of the suit and the demand for arbitration is not determinative. (Doc. 263 at 3 (citing *Walker*, 938 F.2d at 577-578, *see also American Dairy Corp. v. Tantillo*, 536 F. Supp. 718 (M.D. La.1982); *Tristar Financial Ins. Agency, Inc. v. Equicredit Corp. of America*, 97 Fed. App'x 462, 465 (5th Cir. 2004)).) Further, they assert that extensive participation in the litigation does not rise to the level of waiver. (Doc. 263 at 3.) Individual Defendants cite in support the Fifth Circuit case *Tenneco Resins, Inc. v. Davy Int'l, AG*, which states:

> While it is true that Davy waited almost eight months before moving that the district court proceedings be stayed pending arbitration, and, in the meantime, participated in discovery, this and other courts have allowed such actions as well as considerably more activity without finding that a party has waived a contractual right to arbitrate.

(Doc. 263 at 3-4 (citing *Tenneco Resins*, 770 F.2d at 420-21).)

Instead, Individual Defendants argue that for a party to waive its arbitration rights, the party must be actually aware of its right to arbitrate and to choose to proceed with litigation. (Doc. 263 at 4 (citing *Tristar*, 97 Fed. App'x at 464-65 ("Litigating a dispute in ignorance of the right to arbitrate does not demonstrate such a desire.") (citation omitted)).) Therefore, "a party must be knowledgeable of its right to arbitration in order to have waived the right." (Doc. 263 at 5 (citing *Forby v. One Technologies, L.P.,* 909 F. 3d 780, 784 (5th Cir. 2018) ("One Tech was fully aware of its right to compel arbitration when it filed its 12(b)(6) motion to dismiss.")).)

Individual Defendants point the Court to the Fifth Circuit's decision in *TriStar v. Equicredit*, which dealt with a mandatory arbitration clause in a service agreement between the parties. (Doc. 263 at 5 (citing 97 Fed. App'x at 464).) Individual Defendants analogize this case to *TriStar* where, despite Equicredit threatening litigation, conducting discovery, filing motions, and waiting eight months to compel arbitration, the Fifth Circuit reasoned

> Equicredit was in the process of winding down its business and vastly downsizing its staff during the litigation and **did not have the ready access to important documents** that would be expected of a typical ongoing corporate enterprise. According to the appellees' original complaint, Equicredit sold its loan portfolio and all the Equicredit employees who dealt with Tristar are now gone. Given these circumstances and the apparent inadvertence of Equicredit in failing to discover the 1999 agreement, Equicredit should not be deemed to have waived its right to arbitrate. **Waiver is ordinarily the knowing and voluntary relinquishment of a known right.** *See United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted). Such a knowing waiver did not occur here. We have also explained, along the same lines, that **the invocation of the judicial process that effects a waiver requires the waiving party to demonstrate a *desire* to resolve the arbitrable dispute through litigation *rather* than arbitration.** *Texaco Exploration,* 243 F.3d at 912; *Subway Equip. Leasing*

18

> *Corp. v. Forte,* 169 F.3d 324, 329 (5th Cir.1999). **Litigating a dispute in ignorance of the right to arbitrate does not demonstrate such a desire.**
>
> The result would be different if Equicredit deliberately took advantage of the procedures available in court and then sought to compel arbitration. We are persuaded from the record that Equicredit did not so act. The result might also be different if Equicredit sought arbitration only after suffering a major defeat in district court. Again, we are persuaded that Equicredit is not attempting two bites at the apple. It moved to compel arbitration shortly after discovering the existence of the 1999 agreement. **Appellees did not demonstrate deliberate delay on Equicredit's part in seeking arbitration.**

(Doc. 263 at 5-6 (citing *id*. at 466).) Individual Defendants also argue that the Fifth Circuit's statement, that the plaintiff was not on sound footing in arguing waiver when it had failed to disclose the existence of the service agreement with the mandatory arbitration clause, applies in this case. (*Id.*) Further, Individual Defendants contend that the Fifth Circuit dismissed the plaintiff's arguments that the delay was prejudicial because the plaintiff "initiated this suit in federal district court and obviously intended to participate in such pretrial proceedings and discovery as are routine in that forum." (Doc. 263 at 7 (citing *id.* at 464-65; *see also Cleveland v. UBS Financial Services, Inc*., 2011 WL 5870540 (granting a defendant's motion to compel arbitration when it was discovered later in the litigation after defendant had filed motions to dismiss).)

Individual Defendants distinguish Brock's reliance on *Huntington Bank*, arguing that in the production of the arbitration agreements prior to the suit being filed meant that both parties were aware of the mandatory arbitration agreement and nevertheless perused the case in district court. (Doc. 263 at 8 (citing *Huntington Bank*, 77 F.3d 479).) Whereas in this case, the mandatory arbitration agreement was not disclosed to Individual Defendants, nor did they choose to avail themselves of a judicial remedy by filing suit. (Doc. 263 at 8.)

      B.   <u>*Delay in seeking arbitration was the result of Defendants' ignorance of the right*</u>
         <u>*to arbitrate*</u>

      Individual Defendants argue that there is no "adverse" ruling that they are seeking to avoid by filing the motion to compel. (Doc. 263 at 8.) Instead, they assert "[Individual] Defendants were simply unaware of the underlying arbitration agreements." (Doc. 263 at 8.) Individual Defendants explain that they did not recall the arbitration agreement because:

> At the beginning of their employment with Brock, the Individual Defendants signed many documents in connection with their employment, and signed acknowledgments of various updated or amended policies as the years went on. This included but was by no means limited to the Dispute Resolution Policy, and it also included documents or agreements pertaining to hiring, benefits, insurance, training, and other matters. When they terminated their employment with Brock, the Individual Defendants were not provided with copies of the various documents they had signed during their time with Brock. The Individual Defendants could not have possibly recounted each and every document that they signed during their terms of employment.

(Doc. 263 at 8-9 (citing Docs. 263-1-263-5, Declarations of Individual Defendants).) Individual Defendants also maintain that Brock's current employees do not have access to their personnel files nor recall whether they signed the Dispute Resolution Policy. (Doc. 263 at n.3 (citing Doc. 263-6, Dep. of Courtney St. Romain; Doc. 263-7, Dep. of Jeff Paxton).)

      In addition, Individual Defendants argue that the Complaint, in each of its iterations, does not specifically mention the Dispute Resolution Policy. (Doc. 263 at 9) Although Brock attached a copy of one version of the Employee Handbook to its First Amended Complaint, neither the Section 8.1 – Employee Grievances nor Section 8.2 – Dispute Resolution Policy, contain the mandatory arbitration agreement at issue, which was instead a separate agreement not included in the Employee Handbook. (Doc. 263 at 9.) Section 8.1 – Employee Grievances mentions that employees may seek out "arbitration/mediation" as outlined in the Dispute Resolution Policy. Section 8.2 – Dispute Resolution Policy does not mention arbitration. (*Id.*)

Individual Defendants provide a timeline of the litigation to detail that Brock failed to disclose the mandatory arbitration agreement until October 22, 2019. They outline: (1) January 31, 2019, Brock identified the Individual Defendants' personnel files and employment agreements as relevant documents in its initial disclosures, yet failed to provide the Dispute Resolution Files or any documents from the personnel files; and (2) in written discovery requests Brock refused production of the personnel files and documents relating to the Employee Handbook because Brock deemed them "not relevant," as well as proprietary and confidential. (Doc. 263 at 10 (citing Doc. 221-4, at Response to Request for Production No. 25, 30, 31). Individual Defendants detail that on October 22, 2019, the parties met for a Rule 37.1 conference at which counsel for Individual Defendants requested a copy of the Dispute Resolution Policy to which Brock's counsel responded, "Do you mean an arbitration agreement?". The parties agreed that Brock's counsel would provide the Dispute Resolution Policy after a protective order was entered. (Doc. 263 at 10-11.)

Individual Defendants assert that up and until this point, they did not realize that the Dispute Resolution Policy was an arbitration agreement. (Doc. 263 at 11.) As such, counsel for Individual Defendants started to research case law to determine if the Dispute Resolution Policy was referenced in other cases, which it was, and concluded that the arbitration agreement likely applied to this case. (Doc. 263 at 11.) On October 24, 2019, Individual Defendants sent demands for arbitration to counsel for Brock. On October 25, the parties entered a Stipulated Protective Order. (Doc. 263 at 12.) On November 3, and November 4, after Individual Defendants filed the motions to compel at issue, Brock partially produced Individual Defendants' personnel files, including the Dispute Resolution Policies signed by Mr. Rogillio, Mr. Gatlin, and Ms. Redd. (Doc. 263 at 12.)

Individual Defendants contrast the disclosures made by Brock's general counsel, Ms.

Krystal Hunter, in an unrelated action, *Carl Lee v. Brock Services*, to those made in this case. In

the *Lee* case, Ms. Hunter provided an affidavit outlining:

> 1. She is "familiar with Brock's arbitration policy known as the Dispute Resolution Policy;" 2. She has access to the personnel records and files relating to current and former Brock employees; 3. That "Brock has at all relevant times, and continues to this day, to maintain a mandatory arbitration policy **applicable to all employees**. This policy is set forth in the [Dispute Resolution Agreement]…." [and] 4. That Brock **conditioned its decision to employ** Mr. Lee on him signing the Dispute Resolution Policy.

(Doc. 263 at 12-13 (citing Affidavit of Krystal Hunter, *Carl Lee v. Brock Services*, filed

1/31/2018, Case No. 1:17-cv-00272-LG-RHW (S.D. Miss.); attached to Redd's Motion to

Compel Arbitration herein at Doc. 220-6).) In this case, Ms. Hunter's declaration does not

disclose a mandatory mutual arbitration policy. (Doc. 263 at 12 (citing Doc. 21-3).)

Individual Defendants also contrast the disclosures made by Donnie Oliver, Brock's

Human Resources Regional Business Partner, in a declaration in *Hampton, et. al v. McDermott,*

*Inc., et al*, and in his deposition in this case. (Doc. 263 at 13.) In the *Hampton* case, with the

dispute resolution policy attached, Mr. Oliver declared

> (1) "In my role as HR Business Partner, I have access to Brock's policies and personnel records, and I am an authorized custodian of Brock's personnel records." (2) "I personally reviewed Brock's employee records...." (3) "Prior to commencing work for Brock…, Mr. Greene signed a **Dispute Resolution Policy** (the "Agreement"). …The Agreement is a **stand-alone two-page document**." (4) "As part of the **onboarding process** for each project, Brock presented a copy of its Dispute Resolution Policy to Mr. Green…." [and] (5) "In consideration for signing the Agreement, Brock ultimately hired Mr. Green…."

(Doc. 263 at 13-14 (citing Doc. 263-9).) In contrast, Mr. Oliver, in his deposition in this case,

stated he only had a general understanding of an employee's personnel file, denied having

knowledge of the documents relating to onboarding, and failed to mention the dispute resolution

policy or the mandatory arbitration agreement. (Doc. 263 at 13 (citing Doc. 263-8, Deposition of

Donnie Olivier at 7, 20, 43-53).) Individual Defendants conclude that because Brock has filed
motions to compel arbitration under its dispute resolution policy in multiple cases and that
Brock's corporate representatives have made declarations under oath concerning the arbitration
agreement, Brock has improperly hidden the mandatory arbitration agreement from Individual
Defendants in this case. Individual Defendants argue that their motions to compel arbitration,
which were filed soon after learning that the mandatory arbitration agreement applies, were only
delayed because of Brock's actions.

*C.  Brock has not been prejudiced by delay in seeking arbitration*

Individual Defendants argue that Brock has not met its burden to show that it has been
prejudiced by participating in this litigation. (Doc. 263 at 15 (citing *Forby v. One Technologies,
L.P.*, 909 F.3d 780, 784-85 ("In addition to invocation of the judicial process, the party opposing
arbitration must demonstrate prejudice before we will find a waiver of the right to arbitrate.
Prejudice "refers to the **inherent unfairness** in terms of delay, expense, or damage to a party's
legal position that occurs when the party's opponent **forces** it to litigate an issue and later seeks
to arbitrate that same issue.") (citations omitted).)

Because Brock filed suit, despite being aware of the mandatory arbitration agreement,
concealed Individual Defendants' personnel files, and refused production of the Dispute
Resolution Policy until after the motions to compel arbitration had been filed, Individual
Defendants argue that Brock was not prejudiced by the delay. (Doc. 263 at 16.) In addition,
Individual Defendants argue that they are the party prejudiced by the delay in disclosing the
arbitration agreement because Brock filed highly inflammatory allegations against Individual
Defendants in a public forum. (*Id.*) Therefore, Individual Defendants conclude that "Brock is in
no position to play the part of victim." (Doc. 263 at 17.)

2.  Bauer and Rogers are parties to the Dispute Resolution Policy

23

Individual Defendants argue that the Court should conclude Ms. Bauer and Mr. Rogers signed arbitration agreements because Brock has not produced complete copies of Individual Defendants' personnel files; testimony from Brock's corporate representatives in other cases shows that the mandatory arbitration policy is applicable to all employees; and both Ms. Bauer and Mr. Rogers signed updated Employee Handbooks incorporating the terms of the Dispute Resolution Policy by reference. (Doc. 263 at 17-18.)

In the alternative, Individual Defendants argue that if the Court does not find that Ms. Bauer and Mr. Rogers signed the Dispute Resolution Policy, then the Court should apply equitable estoppel to mandate arbitration of the claims against Ms. Bauer and Mr. Rodgers because they are intertwined with the other claims. (Doc. 263 at 19.)

d.  *Brock Service's sur-reply*

1.  <u>Individual Defendants have waived the right to arbitrate</u>

Brock argues that Individual Defendants "do not seriously contest" that they have substantially invoked the judicial process or that Brock will be prejudiced if compelled to arbitrate and therefore the Court should find waiver. (Doc. 267 at 1.)

A.  <u>*Defendants' knowledge arguments are misplaced*</u>

Brock argues that it correctly applied the Fifth Circuit's two prong test to determine if a party has waived arbitration by showing that Individual Defendants (1) substantially invoked the judicial process; and (2) compelling arbitration will prejudice Brock. (Doc. 267 at 4 (citing *Forby*, 909 F. 3d at 783).) Brock reiterates that the Court should ignore Individual Defendants' knowledge arguments because the Individual Defendants personally signed the arbitration agreements and therefore had actual knowledge of their existence. (Doc. 267 at 4.)

Brock contends that accepting the argument that Individual Defendants forgot about the arbitration agreements and therefore do not have knowledge of their arbitration rights would

"eviscerate basic principles of contract law." (Doc. 267 at 5 (citing *In re Cajun Elec. Power Coop., Inc.*, 791 F.2d 353, 359-60 (5th Cir. 1986) ("One who has executed a written contract in ignorance of its contents cannot set up his ignorance to avoid the obligation in the absence of fraud or misrepresentation.")).) Brock distinguishes the cases relied upon by Individual Defendants, reasoning that forgetting an arbitration right is not the same as ignorance of that right. (Doc. 267 at 5.) Further, Brock highlights that unlike *Tristar*, wherein the agreement with the arbitration clause was not referenced in the complaint, Individual Defendants were aware of the Dispute Resolution Policy from September 2016 because Mr. Rogillo's non-competition agreement references the Dispute Resolution Policy.  (Doc. 267 at 5 (citing Doc. 1-1 at ¶ 1).) Finally, Brock maintains that a copy of the Dispute Resolution Policy is in the information that Individual Defendants took with them to Apache and could be found both on the Apache server and on Ms. Bauer's external storage device. (Doc. 267 at 6 (citing Doc. 267 at 1, Dec. of D. Hendershott).)

### B. *Individual Defendants substantially invoked the judicial process*

Brock argues that Individual Defendants substantially invoked the judicial process because of the cumulative actions they took over the year from the commencement of the case to the filing of the motions to compel. (Doc. 267 at 6.) Brock asserts it filed the case seeking emergency injunctive relief and therefore waived its own right of arbitration. Individual Defendants, Brock argues, invoked the judicial process by filing motions to dismiss and appealing the preliminary injunction entered by this Court to the Fifth Circuit. (Doc. 267 at 7.)

Brock posits that Individual Defendants now seek to compel arbitration because the ongoing and "extensive forensics uncovered Apache's pervasive and ongoing misappropriation of Brock's confidential, proprietary, and trade secret information." (Doc. 267 at 7.) Brock argues that waiver seeks to prevent litigants, who like Individual Defendants, "test the waters in

litigation before deciding whether they would be better off in arbitration." (Doc. 267 at 7 (quoting *Nicolas*, 565 F.3d at 909).) Brock argues that Individual Defendants have an improper motive or seek a tactical advantage in compelling arbitration because it was "***just days after*** Brock filed a damaging amended pleading, having identified new facts learned in discovery, that [Individual] Defendants purportedly began searching various federal courts and case law to find out if Brock ever referenced the Dispute Resolution Policy in any other cases." (Doc. 267 at 7.)

### C.  *Compelling arbitration would substantially prejudice Brock*

Further, Brock reiterates that compelling arbitration would substantially prejudice Brock. First, Brock refutes the argument that Individual Defendants were prejudiced by Brock's alleged failure to disclose the Dispute Resolution Policy because it was referenced in the non-competition agreement and within the Employee Handbook and, in addition, was pirated by Ms. Bauer. (Doc. 267 at 7.) Second, Brock details that prejudice will occur because its confidential business information will remain in Apache's hands without the Court's authority to oversee compliance with the settlement order regarding the initial motion for preliminary injunction. (*Id.* at 8) Further, it is prejudiced by accumulating damages because of Individual Defendants and Apache's actions. (*Id.*)  Last, that it is prejudiced by skyrocketing litigation costs by having to re-litigate issues without the institutional knowledge of the Court. (Doc. 267 at 8.)

### 2.  Non-signatories should not be permitted to compel arbitration

### A.  *The presumption against permitting non-signatories to arbitrate, which weighs in favor of finding waiver*[7]

Brock argues that Bauer, Rogers and Apache are non-signatories to any arbitration agreement with Brock. As such, it asserts that estoppel does not warrant arbitration of the claims against the non-signatories. (Doc. 267 at 9.)

---

[7] Brock incorporates the arguments in its response to Apache's *Motion to Compel Arbitration*. (Doc. 260.)

B.  *Brock's decision to not waive its arbitration rights in other disputes is irrelevant*

Brock urges the Court to ignore Individual Defendants' arguments regarding its decision to pursue arbitration in other cases because: (1) Brock may waive arbitration rights and pursue litigation; (2) this case is unique because it was filed to pursue emergency injunctive relief; (3) Individual Defendants did not ask the corporate representative Mr. Oliver about the Dispute Resolution Policy during his deposition; (4) Brock, in the other cases, acted timely to compel arbitration. (Doc. 267 at 9-10.) Therefore, Brock concludes that the Court should find Individual Defendants waived their right to arbitration and deny the motions to compel.

e.  *Apache's arguments*

Apache acknowledges that it is not a signatory to an arbitration agreement, but it also argues that compelling arbitration of Brock's claims against Apache is appropriate under the equitable estoppel theory of intertwined claims. (Doc. 249-3 at 1.) In the alternative, Apache asks the Court to stay Brock's claims against Apache pending the completion of arbitration between the Individual Defendants and Brock. (Doc. 249-3 at 2.)

1.  The Court should compel arbitration of Brock's claims against Apache under the intertwined-claims doctrine.

Apache argues that equitable estoppel, specifically the intertwined claims doctrine, permits a non-signatory to an arbitration agreement to compel a signatory to arbitrate if either: (1) the signatory asserts a contractual claim against a non-signatory, then refuses to honor the arbitration provision in that contract; or (2) the signatory asserts a claim of substantially interdependent and concerted misconduct by both the non-signatory and one or more of the signatories to the contract. (Doc. 249-3 at 3 (citing *Pershing, LLC v. Bevis*, 606 Fed. Appx. 754, 757 (5th Cir. 2015)).) Under the second theory, Apache argues that a third-party non-signatory can compel arbitration:

when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract. **Otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted**.

(Doc. 249-3 at 3-4 (quoting *Grigson v. Creative Artists Agency*, *LLC*, 210 F.3d 524, 527 (5th Cir. 2000), quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (emphasis added by Apache)).)

Apache cites as support *Grigson v. Creative Artists Agency L.L.C.*, in which the Fifth Circuit affirmed the District Court's order compelling arbitration of a third-party non-signatory on the basis of the intertwined claims theory. (Doc. 249-3 at 4 (citing *Grigson*, 210 F.3d at 528-530).) Apache argues that the Fifth Circuit, in *Grigson*, recognized that applying equitable estoppel to compel arbitration of claims against a non-signatory prevents "an obvious attempt to make end-run around [an] arbitration clause." (*Id.* at 5.)

Apache also maintains that the Fifth Circuit examined the application of equitable estoppel by non-signatory under the intertwined claims doctrine in *Hill v. G E Power Systems, Inc.*, 282 F.3d 343 (5th Cir. 2002). In *Hill*, the plaintiff alleged that "GECC and GEPSI worked in tandem to misappropriate Canatxx's trade secrets and to fraudulently induce it to contract with them." (Doc. 249-3 at 6 (citing *Hill*, 282 F.3d at 349).) Although GECC was not a signatory to the arbitration agreement, it filed a motion to compel arbitration and a motion to stay the proceeding until arbitration had been completed. (*Id.*) The district court denied both motions. (*Id.*) The Fifth Circuit reversed on the issue of staying the litigation because the claims were "inseparable in any practical way." (*Id.* (citing *Hill*, 282 F.3d at 348).) The Fifth Circuit affirmed the district court's denial of the motion to compel arbitration using an abuse of discretion standard. However, the Fifth Circuit also clarified that it would have been within the district courts discretion to compel arbitration under the intertwined-claims doctrine, reasoning:

28

That second circumstance is "when the signatory to the contract containing an arbitration clause raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." The complaint alleged that GECC and GEPSI worked in tandem to misappropriate Canatxx's trade secrets and to fraudulently induce it to contract with them. At the same time Canatxx is denying that its claims are intertwined with the Termination Agreement, it alleges interdependent and concerted misconduct by GECC and GEPSI.

(Doc. 249-3 at 7 (citing *Hill*, 282 F.3d at 349).)

Applying the Fifth Circuit standard, Apache argues that it meets the second basis for

applying the intertwined claims doctrine, reasoning:

Brock (signatory) has asserted claims of *actual* (not merely substantially) interdependent and concerted misconduct between the nonsignatory (Apache), and, not merely one but with *all* of the other signatories (Individual Defendants). *Grigson*, *supra*. Brock's claims against Apache arise out of *exact same* operative facts at issue between Brock and the Individual Defendants. Brock alleges that the Individual Defendants violated the terms of their employment and the law by taking jobs at Apache and divulging trade secrets and other confidential information to the company, its major competitor. Brock even specifically pleads conspiracy, alleging that Apache and the Individual Employees conspired to improperly obtain and then use Brock confidential, proprietary information and/or trade secrets to unlawfully compete, profit from, and to harm Brock.

(Doc. 249-3 at 8.)

In addition, Apache points out that the Dispute Resolution Policy specifically

contemplates non-signatory third parties such as "Company Customers." The Dispute Resolution

Policy also applies to trade secret claims such as those at issue in this case. Apache argues that

because it rents scaffolding from Brock, it falls under the definition of "Company Customer,"

which the Dispute Resolution Policy specifically incorporates as a third-party beneficiary. (Doc.

263 at 8.)  Therefore, Apache concludes that Brock should not be surprised by Apache seeking to

arbitrate these claims "given the broad language of its arbitration provision and the nature of this

dispute." (Doc. 249-3 at 9-10.)

2. <u>In the alternative, Brock's claims against Apache should be stayed until arbitration has been completed.</u>

29

In the alternative, Apache asks the Court to stay Brock's claims against Apache pending the completion of arbitration. Apache again cites *Hill* which explained the justification of the stay, stating:

> We have long held that if a suit against a nonsignatory is based upon the same operative facts and is inherently inseparable from the claims against a signatory, the trial court has discretion to grant a stay if the suit would undermine the arbitration proceedings and thwart the federal policy in favor of arbitration . . . . A suit against a nonsignatory that is based upon the same operative facts and is inherently inseparable from the claims against a signatory will always contain "issue[s] referable to arbitration under an agreement in writing."

(Doc. 249-3 at 9 (citing *Hill*, 282 F.3d at 347).) Apache reasons that because Brock's claims against Apache and Individual Defendants are intertwined in the same operative facts, permitting Brock's claims to go forward would thwart the federal policy in favor of arbitration. (Doc. 249-3 at 9.)

*f.   Brock Service's response*

1.   Apache waived the ability to argue arbitration should be compelled

      A.   *Apache substantially invoked the judicial process*

Brock reiterates its arguments regarding waiver stating that Apache substantially invoked the judicial process and compelling arbitration would prejudice Brock. (Doc. 260 at 3 (citing *Walker*, 938 F.2d at 577).) Brock outlines that Apache litigated the case without reference to arbitration and did not move to compel arbitration "until *after* Brock discovered additional information that is damning to Apache's case, which in turn prompted Brock to seek leave to file a Fourth Amended Complaint." (Doc. 260 at 5.) Moving to compel arbitration at this point in the litigation is "effectively trying to hit a restart button . . . after Brock has developed evidence showing that its illegal actions are even more extensive than previously known." (Doc. 260 at 6.)

> ### B. *Compelling arbitration would prejudice Brock*

Brock reasserts that it would be prejudiced, if the Court compelled arbitration. (Doc. 260 at 6-7.) Specifically, Brock argues that:

> *First*, Brock's legal position would be damaged because Apache can bypass rulings of the Court and get a second chance at seeking dismissal of Brock's claims after learning why its arguments failed the first time. *Second*, the heavily negotiated settlement agreement, forensic protocols, and scheduling order overseen by the Court will have to be renegotiated in arbitration, and the arbitrator will lack the institutional knowledge this Court has developed that is necessary to resolve disputes concerning the information the parties have already exchanged. *Third*, further delay will result in increased damages to Brock, as the Individual Defendants and Apache *remain in possession* of its confidential information. *Fourth*, Apache's effort to re-litigate the claims against it will dramatically increase litigation costs, and Brock has already incurred *hundreds of thousands* of dollars in fees and costs to date, which include fees for participation in nearly a dozen status conferences to educate the Court—and not an arbitrator—concerning the issues between the parties. *Fifth*, compelling Brock to arbitrate would deprive Brock of the ability to seek to have its additional claims against Apache—which are set forth in the proposed Fourth Amended Complaint—litigated as part of a single case where Brock can look to redress Apache's corporate practice of hiring Brock employees to bring Brock's information with them to Apache for Apache's use and benefit.

(Doc. 260 at 6-7.)

> ### 2. Apache cannot compel arbitration through equitable estoppel

Brock argues that because Apache is a non-signatory to the arbitration agreement, the Court should decline to use the equitable estoppel exception to compel arbitration because this case does not present the rare circumstances in which the intertwined claims doctrine applies. (Doc. 260 at 8.) Brock argues that unlike the scenarios in place in *Grigson*, where the plaintiff took action solely against the non-signatory after the other claims were sent to arbitration, in this case Brock:

> did not confine this action to the non-signatory (Apache) alone, but rather named Apache as a defendant when it added several of the Individual Defendants whom Apache now argues had signed arbitration agreements. Those arbitration agreements, moreover, are not the cornerstone of this case. Brock instead alleges a web of tortious and illegal conduct, involving the Individual Defendants' mass

downloads of files containing confidential, proprietary, and trade secret information and their use of that information upon arrival at Apache for Apache's benefit. Brock's claims against Apache are not contractual causes of action. Rather, the Third Amended Complaint brings claims for violations of the Defend Trade Secrets Act and the Louisiana Uniform Trade Secrets Act, violations of the Louisiana Unfair Trade Practice Act, conspiracy, and unjust enrichment.

(Doc. 260 at 9.)

Brock also argues that compelling arbitration under an equitable doctrine "would fly in the face of fairness" because Brock would be prejudiced by the decision to compel arbitration. (Doc. 260 at 10 (citing *Grigson* 210 F.3d at 528).) Brock concludes that the equities weigh in favor of denying a motion to compel arbitration because Apache and Individual Defendants waived the right to compel arbitration by substantially invoking the judicial process.

*g.  Apache's reply*

1.  <u>Brock has no basis to assert waiver against any of the Defendants, including Apache.</u>

Apache reiterates that Brock's arguments regarding waiver lack merit and incorporates the facts and law presented in the Individual Defendants' Reply Brief. (Doc. 268 at 1 (citing Doc. 263).) Apache summarizes that waiver is not applicable because Apache did not know that Brock had a mandatory arbitration policy and failed to inform any of Defendants or the Court of its existence. (*Id.*)

2.  <u>Brock misinterprets the applicable case law related to the intertwined-claims doctrine.</u>

Apache argues that Brock incorrectly combines the two stand alone scenarios in which a court may apply the intertwined claims doctrine. (Doc. 268 at 2.) Apache asserts that under the second scenario, the underlying dispute does not need to be contractual. (Doc. 268 at 2-3.) Apache cites *Brown v. Pacific Life Ins. Co.*, in which the Fifth Circuit found that the second scenario was sufficient to permit a non-signatory to compel arbitration when the alleged intertwined misconduct was based purely on tort law. (Doc. 268 at 3 (citing *Brown v. Pacific Life*

*Ins. Co.*, 462 F.3d 384 (5th Cir. 2006)).) In affirming the district court's decision to compel arbitration the Fifth Circuit reasoned, "whether and how GE and Pacific defrauded or breached duties owed to the Browns depends, in some part, upon the nature of the tortious acts allegedly committed by Holt and Smith Barney—acts that would be covered by the arbitration agreement…." (Doc. 268 at 3 (citing *Id.* at 399).) Therefore, because the tortious acts were not separate and apart from those alleged against the other defendants, the complaint alleged concerted misconduct on all parties. (*Id.*) Apache argues that the instant case is similar because Brock's Third Amended Complaint alleges that Apache and Individual Defendants conspired to misappropriate trade secrets. (Doc. 268 at 4.)

Apache further argues that the scope of Brock's Dispute Resolution policy is broad and not limited to contractual disputes but rather "any and all actions that may exist in law or equity, including claims arising out of *or* merely related to the Individual Defendants' employment relationship with Brock, and even specifically includes claims involving trade secrets." (Doc. 268 at 4.)  On this basis, Apache argues it is entitled to seek arbitration through equitable estoppel and the intertwined claims doctrine. (Doc. 268 at 4.)

3. <u>Brock did not oppose Apache's request for a stay.</u>

Apache points out that Brock did not submit any opposition to a stay of its claims against Apache in the event that the Court compels Individual Defendants and Brock to arbitrate. (Doc. 268 at 5.)

### III.   <u>APPLICABLE LAW</u>

*a.  Federal Arbitration Act*

As set forth by the Supreme Court, "the Federal Arbitration Act requires courts to enforce covered arbitration agreements according to their terms." *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1412, 203 L. Ed. 2d 636 (2019). Section Two of the Federal Arbitration Act provides, "A

written provision in any . . . contract evidencing a transaction involving commerce to settle by

arbitration a controversy . . .  shall be valid, irrevocable, and enforceable, save upon such

grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. "The

[Federal Arbitration] Act, [the Supreme] Court has said, establishes 'a liberal federal policy

favoring arbitration agreements.'" *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621, 200 L. Ed. 2d

889 (2018) (quoting, *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1,

24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983)). Congress, in enacting the Federal Arbitration Act,

found that "arbitration had more to offer than courts recognized—not least the promise of

quicker, more informal, and often cheaper resolutions for everyone involved.  So Congress

directed courts to abandon their hostility and instead treat arbitration agreements as valid,

irrevocable, and enforceable." *Id.* (internal citations omitted).

As set forth by the Fifth Circuit in *Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th

Cir. 1996), a motion to compel under the Federal Arbitration Act requires the Court to make a

two-step inquiry.

> The first step is to determine whether the parties agreed to arbitrate the dispute in
> question.  This determination involves two considerations: (1) whether there is a
> valid agreement to arbitrate between the parties; and (2) whether the dispute in
> question falls within the scope of that arbitration agreement.  When deciding
> whether the parties agreed to arbitrate the dispute in question, courts generally ...
> should apply ordinary state-law principles that govern the formation of contracts.
> In applying state law, however, due regard must be given to the federal policy
> favoring arbitration, and ambiguities as to the scope of the arbitration clause itself
> must be resolved in favor of arbitration.  The second step is to determine whether
> legal constraints external to the parties' agreement foreclosed the arbitration of
> those claims.

*Webb*, 89 F.3d at 257–58 (internal quotation marks and citations omitted).

*b.  Waiver of right to arbitration*

One legal constraint that can foreclose arbitration of claims is waiver. Under Fifth Circuit

precedent, "the right to arbitrate—like all contract rights—is subject to waiver." *Forby*, 909 F.3d

at 783 (citing *Nicholas v. KBR, Inc.*, 565 F.3d 904, 907 (5th Cir. 2009)). Whether a party's conduct "constitutes a waiver of the right of arbitration depends on the facts of each case." *In re Mirant Corp.*, 613 F.3d 584, 589 (5th Cir. 2010) (quoting *Tenneco Resins*, 770 F.2d at 420). Therefore, in the Fifth Circuit, "a bright-line rule is inappropriate for deciding whether a party has waived its right to arbitration." *In re Mirant Corp.*, 613 F.3d at 589. "There is a strong presumption against finding a waiver of arbitration, and the party claiming that the right to arbitrate has been waived bears a heavy burden." *Id.* at 588. "[A] party waives its right to arbitrate if it (1) substantially invokes the judicial process and (2) thereby causes detriment or prejudice to the other party." *Forby*, 909 F.3d at 783 (internal citations and quotations omitted).

Under the first prong, "To invoke the judicial process, a party "must, at the very least, engage in some overt act in court that evinces a desire to resolve the arbitrable dispute through litigation rather than arbitration." *Id.* at 784.  As such, "[a] party waives arbitration by seeking a decision on the merits before attempting to arbitrate." *Id.*

The Fifth Circuit has explained that "[w]aiver is ordinarily the knowing and voluntary relinquishment of a known right." *Tristar*, 97 F. App'x at 465 (citing *see United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the intentional relinquishment or abandonment of a known right.") (internal quotation marks omitted)). Therefore, the Fifth Circuit has explained "that the invocation of the judicial process that effects a waiver requires the waiving party to demonstrate a *desire* to resolve the arbitrable dispute through litigation *rather* than arbitration. . . .  Litigating a dispute in ignorance of the right to arbitrate does not demonstrate such a desire." *Tristar*, 97 F. App'x at 465 (citing *Texaco Expl. & Prod. Co. v.*

*AmClyde Engineered Prod. Co.*, 243 F.3d 906, 912 (5th Cir. 2001); *Subway Equip. Leasing*

*Corp. v. Forte,* 169 F.3d 324, 329 (5th Cir.1999)).

For example, in *Forby v. One Techs., L.P.*, 909 F.3d at 784, the Fifth Circuit found that

the defendant, One Tech, substantially invoked the judicial process by filing a motion to dismiss.

One Tech successfully transferred the case from Illinois to Texas by citing the right to

arbitration. *Id.*

> However, once in Texas, One Tech did not move to compel arbitration even in the
> alternative to its motion to dismiss. Rather, it pursued and partially obtained a
> dismissal with prejudice of Forby's claims. One Tech's action of moving to dismiss
> Forby's claims with no mention of compelling arbitration demonstrated a desire to
> resolve the dispute in litigation rather than arbitration. One Tech was fully aware
> of its right to compel arbitration when it filed its 12(b)(6) motion to dismiss. After
> all, it presented the right to arbitration as the reason it sought to transfer the case
> from Illinois to Texas.

*Id.* Therefore, because One Tech knew it had a right to arbitrate and instead availed itself of the

Court to dismiss the claims with prejudice before compelling arbitration, the Fifth Circuit found

that the first prong had been met. *Id.*

In contrast, the Fifth Circuit declined to find waiver of the right to arbitrate in *Tristar*, 97

F. App'x at 465. As the Fifth Circuit explained:

> Equicredit was simply unaware of the 1999 agreement until it was produced in
> discovery, and promptly moved to compel arbitration once it became aware of
> the arbitration clause. It also moved for a stay and an expedited ruling on the motion
> to compel arbitration. Equicredit was in the process of winding down its business
> and vastly downsizing its staff during the litigation and did not have the ready
> access to important documents that would be expected of a typical ongoing
> corporate enterprise. According to the appellees' original complaint, Equicredit sold
> its loan portfolio and all the Equicredit employees who dealt with Tristar are now
> gone. Given these circumstances and the apparent inadvertence of Equicredit in
> failing to discover the 1999 agreement, Equicredit should not be deemed to have
> waived its right to arbitrate.

*Id.*; *see Williams v. Cigna Financial Advisors, Inc.,* 56 F.3d 656 (5th Cir.1995), (holding a

defendant did not waive its right to arbitrate where a defendant discovered that the plaintiff had

signed an arbitration agreement after the district court had denied its motion to dismiss, and thereafter promptly moved for a stay in the proceeding.) In both *Forby* and *Tristar*, the Fifth Circuit recognized that for a party to substantially invoke the judicial process in a manner that indicates its desire to litigate rather than arbitrate, it must first know that it has a right to arbitrate.

Under the second prong, a party must also demonstrate prejudice. *Id.* "Prejudice refers to the inherent unfairness in terms of delay, expense, or damage to a party's legal position that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Forby*, 909 F.3d at 784-785 (citing *Republic Ins. Co. v. PAICO Receivables, L.L.C.*, 383 F.3d 341, 346 (5th Cir. 2004)). Delay alone does not constitute prejudice. *Id.* at 785.

> Prejudice occurs if,
>
> a party will have to re-litigate in the arbitration forum an issue already decided by the district court in its favor. . . . A party does not get to learn that the district court is not receptive to its arguments and then be allowed a second bite at the apple through arbitration.

*Id.* (internal quotation marks and citations omitted). In addition, prejudice may occur if a party "is forced to disclose items in discovery that would be undiscoverable in arbitration . . . [or] where the opposing party conducts a deposition of a third-party witness that an arbitrator could have disallowed." *Tellez v. Madrigal*, 292 F. Supp. 3d 749, 763 (W.D. Tex. 2017). "However, when only a minimal amount of discovery has been conducted, which may also be useful for the purpose of arbitration, the court should not ordinarily infer waiver based upon prejudice to the party opposing the motion to stay litigation." *Tenneco*, 770 F.2d at 421. The Fifth Circuit instructs courts to consider three factors in determining if prejudice has occurred, "(1) whether discovery occurred relating to arbitrable claims; (2) the time and expense incurred in defending against a motion for summary judgment; and (3) a party's failure to timely assert its right to

arbitrate." *Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009).

c. *Compelling arbitration by a third-party non-signatory under equitable estoppel*

The Fifth Circuit has recognized that "[a]lthough arbitration is a matter of contract that generally binds only signatories, a party to an arbitration agreement may be equitably estopped from litigating its claims against non-parties in court and may be ordered to arbitration." *Brown v. Pac. Life Ins. Co.*, 462 F.3d 384, 398 (5th Cir. 2006). First recognized by the Court in *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000),

> a non-signatory to an arbitration agreement can compel arbitration: (1) when the signatory to a written agreement containing an arbitration clause must rely on the terms of the written agreement in asserting its claims against a non-signatory; or (2) when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract."

*Brown v. Pac. Life Ins. Co.*, 462 F.3d at 398 (citing *Grigson*, 210 F.3d at 527). Key to applying the second test is "the fact that none of the claims against the non-signatories c[an] be considered without analyzing the 'tortious acts' of the signatories." *Palmer Ventures LLC v. Deutsche Bank AG*, 254 F. App'x 426, 432 (5th Cir. 2007).

Compelling arbitration by a non-signatory under either test is appropriate because "otherwise the arbitration proceedings between the two signatories would be rendered meaningless and the federal policy in favor of arbitration effectively thwarted." *Grigson*, 210 F.3d at 527. Therefore, the "[p]rinciples of estoppel [a]re applied against *signatories to the arbitration agreement* to prevent unfair gamesmanship." *USHealth Grp., Inc. v. South*, 636 F. App'x 194, 199 (5th Cir. 2015) "[T]he result in *Grigson* and similar cases makes sense because the parties resisting arbitration had expressly agreed to arbitrate claims of the very type that they

asserted against the nonsignatory." *Bridas S.A.P.I.C. v. Gov't of Turkm.,* 345 F.3d 347, 361 (5th

Cir.2003).

> For example, in applying the second test under *Grigson*, the Eastern District of Louisiana

explained that compelling arbitration by the non-signatory was appropriate because

> The Ryans raise allegations of substantially interdependent and concerted
> misconduct by both Federal, the non-signatory, and Thunder, a signatory to the
> arbitration agreement. According to the Ryans, Federal's active involvement in the
> vetting, hiring and supervision of Thunder demonstrates the clear existence of a
> master/servant relationship. The Ryans note that Federal further participated in the
> repair process as Thunder's "construction manager."  In fact, the Ryans assert that
> Federal and Thunder were a "package deal" and had together formed a "symbiotic
> relationship where Thunder would keep the claim low and Federal would continue
> to feed Thunder funding." The Ryans' language leaves little doubt as to their
> allegations of concerted misconduct between Federal and Thunder.
>
> . . .
>
> Furthermore, the Ryans' claim against Federal is predicated, at least in part, upon
> Thunder's conduct that constituted the alleged breach of contract. Because the
> breach of contract dispute is within the scope of the arbitration agreement between
> Thunder and the Ryans, the Ryans' allegations against Federal also constitute
> allegations of substantially interdependent and concerted misconduct.

*Ryan v. Thunder Restorations, Inc.*, No. CIV. 09-3261, 2011 WL 2680482, at *9 (E.D. La. July

8, 2011).

IV.    <u>ANALYSIS</u>

*a. Whether Brock's Dispute Resolution Policy is a valid agreement to arbitrate that covers the
   claims made in this case.*

> In considering whether to grant a motion to compel arbitration the Court must first

determine "whether the parties agreed to arbitrate the dispute in question.  This determination

involves two considerations: (1) whether there is a valid agreement to arbitrate between the

parties; and (2) whether the dispute in question falls within the scope of that arbitration

agreement." *Webb*, 89 F.3d at 257–58. The parties do not dispute that Brock's Dispute

Resolution Policy is a valid arbitration agreement, in writing, between Brock and Mr. Rogillio,

39

Ms. Redd, and Mr. Gatlin. Therefore, the Court turns to whether the dispute in question falls within the scope of Brock's Dispute Resolution Policy.

As set forth previously, Brock's Dispute Resolution Policy defines the scope as:

> Each, every, any and all claims, disputes and/or controversies now existing or later arising between or among the Parties, or between or among the employees of The Brock Group and any other person or entity constituting the Company or a Company Customer, whether now known or unknown, arising out of or related to employment or termination of employment with The Brock Group shall be resolved only through final and binding arbitration, pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq., and not by way of court or jury trial. *Such claims, disputes, and/or controversies, without limitation, include those arising out of or relating to: all issues of arbitrability, including but not limited to unconscionability and all grounds as may exist at law or in equity for the revocation of any contract, the interpretation or application of this Dispute Resolution Policy, employment application process, employment relationship, the Company's Customers, all property upon which, and/or with which the employee has or may perform any work or services for or on behalf of any person, trade secrets, unfair competition, compensation, breaks and rest periods, termination, or harassment and claims arising under the Uniform Trade Secrets Act, Civil Rights Act of 1964, Americans With Disabilities Act, Age Discrimination in Employment Act, Family Medical Leave Act, Fair Labor Standards Act, Employee Retirement Income Security Act, and federal, state, or other statutes and/or ordinances, if any, addressing the same or similar subject matters, and all other federal, state, or other statutory and common law claims including retaliation claims (but excluding other workers' compensation and unemployment insurance claims).*

(Doc. 267-1 at 61-62 (emphasis added).)

The Fifth Circuit distinguishes between narrow and broad arbitration clauses. "If the clause is broad, the action should be stayed and the arbitrators permitted to decide whether the dispute falls within the clause." *Complaint of Hornbeck Offshore (1984) Corp.*, 981 F.2d 752, 754 (5th Cir. 1993). "Narrow arbitration clauses are ones where the language of the clause requires the arbitration of disputes 'arising out of' the agreement, whereas broad arbitration clauses are those where the language of the clause requires arbitration of 'any dispute that arises out of or relates to the agreement,' or disputes that are 'in connection with' the agreement." *Baudoin v. Mid-Louisiana Anesthesia Consultants, Inc.*, 306 F. App'x 188, 192 (5th

Cir. 2009). The scope of Brock's Dispute Resolution policy is broad as it contains "Each, every, any and all claims, disputes and/or controversies . . . arising out of or related to employment or termination of employment with The Brock Group." (Doc. 267-1 at 61.) Even if scope of the Dispute Resolution Policy were narrow, it specifically includes claims relating to "trade secrets, unfair competition, compensation, . . . and claims arising under the Uniform Trade Secrets Act." (*Id.*) Therefore, the Court holds that disputes in question between Brock and Mr. Rogillio, Ms. Redd, and Mr. Gatlin fall within the scope of the Dispute Resolution Policy.

*b.   Whether Individual Defendants and Apache waived the right to arbitrate.*

Brock argues that Individual Defendants and Apache waived the right to arbitrate by substantially invoking the judicial process to the detriment of Brock. Individual Defendants and Apache counter that they did not substantially invoke the judicial process, asserting that because Brock failed to disclose the Dispute Resolution Policy, they were unaware of their right to arbitrate when they engaged in their full-throated defense in litigation.

1.   Individual Defendants and Apaches' litigative efforts did not evince a desire to litigate rather than arbitrate because they did not know that the right to arbitrate existed.

Although a signatory to an arbitration agreement can waive its right to arbitrate, the Fifth Circuit has indicated invoking the judicial process "requires the waiving party to demonstrate a *desire* to resolve the arbitrable dispute through litigation *rather* than arbitration. . . . Litigating a dispute in ignorance of the right to arbitrate does not demonstrate such a desire." *Tristar*, 97 F. App'x at 465. To the extent that the Individual Defendants' personnel files were disclosed after Individual Defendants filed their *Motions to Compel Arbitration*, Brock and Individual Defendants signed the Dispute Resolution Policy, during the on-boarding process. Individual Defendants were not given copies of their personnel files when they left Brock in 2018. Brock did not attach a copy of the Dispute Resolution Policy, or the 2008 Employee Manual that

incorporates a copy of the Dispute Resolution Policy to any pleading in this case. It was only

through counsel for Brock's inadvertent statement "do you mean the arbitration agreement" at a

Rule 37.1 Conference that the Individual Defendants were made aware of the substance of the

Dispute Resolution Policy.

Brock argues that it is not possible that Individual Defendants were not aware of the

Dispute Resolution Policy and the fact that it included an arbitration agreement. Brock points to

the fact that Individual Defendants signed the Dispute Resolution Policy; that the 2016

Employee Handbook references the Dispute Resolution Policy; and Brock has disclosed the

Dispute Resolution Policy in pleadings in other cases. Brock also asserts that Apache's server

has a copy of the Dispute Resolution Policy because Ms. Bauer pirated a copy when she left

Brock.  Brock argues that Individual Defendants and Apache only seek to arbitrate this dispute

because discovery has revealed the extent of Apache's misconduct.

The Court finds that Individual Defendants did not know that the Dispute Resolution

Policy contained an arbitration agreement that applied in this case. As Individual Defendants

argue, this case is similar to that of *Tristar*, in which the Fifth Circuit stated:

> We do not condone a party's failure to apprise itself of its own key documents in
> litigation. We note, however, that appellees did not mention the 1999 agreement in
> their original complaint, but instead only made mention of a 1997 service
> agreement that did not contain an arbitration clause. Only after Equicredit
> discovered the 1999 agreement and moved to compel arbitration did appellees seek
> leave to file an amended complaint making reference to the 1999 agreement as an
> agreement relevant to the dispute. We can only conclude that appellees either
> deliberately concealed the existence of the 1999 agreement, hoping to induce a
> waiver of arbitration by Equicredit, or were themselves unaware of it or its
> significance. In either case they are not on a sound footing in arguing that Equicredit
> waived its right to arbitrate by failing to discover the 1999 agreement earlier.

*Tristar*, 97 F. App'x at 466. As previously discussed, Brock did not disclose the Dispute

Resolution Policy in any of its amended complaints, instead attaching the 2016 Employee

Handbook that omitted a copy of the Dispute Resolution Policy. It was only in its sur-reply to

these *Motions to Compel Arbitration*, that Brock attached the 2008 Employee Handbook that incorporated the Dispute Resolution Policy. Accepting that after eight years, Individual Defendants were not intimately aware of the terms of the Dispute Resolution Policy, there is nothing in the record that would have put Individual Defendants on notice that the Dispute Resolution Policy contained an applicable arbitration agreement. Once Individual Defendants were informed that the Dispute Resolution Policy contained an applicable arbitration agreement, they moved quickly to compel arbitration and sought a stay of these proceedings.

Further, whether Individual Defendants, including Ms. Bauer, pirated confidential and proprietary information is a question of fact that is central to the allegations in this case. Brock provides a declaration that states a flash drive used by Ms. Bauer was found with of a copy of the 2008 Employee Handbook that incorporates the Dispute Resolution Policy and asks the Court to impute this to the other Individual Defendants and Apache. As explained by the Fifth Circuit, common law principals relating to imputing knowledge,

> tell us that "a court may deem only the knowledge of officers and employees at a certain level of responsibility imputable to the corporation." Fletcher § 790. Although "knowledge of agents who are not officers may be imputed to the corporation[,] ... [k]nowledge of a mere employee of the corporation ordinarily is not imputed to the company." *Id.* § 807. "Whether an individual's knowledge will be imputed to the corporation depends on a factual determination, according to the particular circumstances, of the individual's position in the corporate hierarchy," which includes asking if the "employee has sufficient responsibility or authority to impute his knowledge to the corporation...." *Id.*

*United States ex rel. Vavra v. Kellogg Brown & Root, Inc.*, 848 F.3d 366, 374 (5th Cir. 2017). Brock alleges that Ms. Bauer did not herself sign a Dispute Resolution Policy (and therefore could not have a right to arbitrate that can be waived). Further Brock does not provide evidence relating to why the Court should impute any knowledge Ms. Bauer might have had onto the other Individual Defendants or Apache.

In addition, the fact that a copy of the 2008 Employee Handbook was found on Apache's servers, does not show that Apache itself knew of the terms of the Dispute Resolution Policy. When the copy of the 2008 Employee Handbook was placed on the server, who accessed the copy and when, are all questions of fact that go to Apache's knowledge. While knowledge is a central question, Brock has not carried its burden of showing that Individual Defendants or Apache had actual knowledge of the right to arbitrate and instead chose to litigate.

Therefore, the Court holds that Individual Defendants and Apaches' efforts in defending this litigation prior to the disclosure that there was an applicable arbitration agreement do not evince a desire to proceed in litigation rather than arbitration. As such, Individual Defendants and Apache did not substantially invoke the judicial process and waive their right to arbitrate the dispute.

2. Even if the Court were to conclude that Individual Defendants and Apache knew that they had a right to arbitrate the dispute and therefore substantially invoked the judicial process, it is not clear that Brock has been prejudiced by the delay.

If the Court had determined that Individual Defendants and Apache have substantially invoked the judicial process in a way that evinces a desire to proceed in litigation rather than arbitration, the question turns to whether Brock was prejudiced by the delay in seeking to compel arbitration. There is no question that Individual Defendants and Apache actively litigated this case. In the course of this litigation they filed motions to dismiss, which were granted in part and denied in part; unsuccessfully defended against a preliminary injunction, which was then appealed; engaged in discovery pursuant to a stipulated forensic protocol and protective order; and filed answers. However, this litigation also seems to be spinning its wheels. While the *Motions to Compel Arbitration* were pending, Brock filed a *Motion for Leave to File a Fourth Amended Complaint* and is now seeking a preliminary injunction and temporary restraining order against Apache. If permitted to file a Fourth Amended Complaint, Individual Defendants and

Apache are again faced with needing to file Rule 12 motions and possibly answers. To the extent that the parties' legal positions have altered over the course of the litigation, it is only because of information learned in discovery, which arguably has benefitted Brock as it continues to make new allegations.

Brock argues that it faces prejudice from the delay in seeking to compel arbitration because: (1) Individual Defendants can bypass rulings of the Court to re-seek dismissal of Brock's claims; (2) the settlement agreement, forensic protocols, and scheduling orders will have to be renegotiated in arbitration by the arbitrator; (3) further delay will increase damages to Brock due to the confidential information allegedly held by Apache and Individual Defendants; (4) Brock will face increased costs of litigation. (Doc. 256 at 8.)

Brock argues that arbitration will allow Individual Defendants and Apache to re-urge dismissal to get a second bite at the apple. The Fifth Circuit looks with disfavor on parties who only seek to arbitrate after receiving an adverse ruling from a court. *In re Mirant Corp.*, 613 F.3d at 589. The Court has ruled on Individual Defendants and Apache's Motion to Dismiss and granted in part and denied in part that motion. However, to the extent that the Court ruled against Individual Defendants and Apache, the Court found only that the Second Amended Complaint pled sufficient facts to state a claim and did not go to the merits of the case. The Court in fact ruled in favor of Individual Defendants and Apache on whether Brock could state a claim for the Defend Trade Secrets Act and Louisiana Uniform Trade Secrets Act claims against Mr. Rogillio and Mr. Gatlin and dismissed those claims with prejudice.[8] Brock, therefore, not Defendants, would receive a second bite at the apple to allege claims against Mr. Rogillio and Mr. Gatlin in

---

[8] Brock filed a Third Amended Complaint with the consent of the Individual Defendants and Apache, which realleged the claims the Court dismissed.

arbitration. Therefore, the re-litigation of issues raised in the Motion to Dismiss does not weigh in favor of finding prejudice.

Brock also argues that all of the stipulations reached in this case will be undone and will necessarily have to be renegotiated with the arbitrator. The Court does not agree. Brock has not shown that the parties would necessarily look to change their positions on discovery, or the forensic protocol used. As the parties worked diligently to reach a stipulation, it seems to the Court that such a stipulation could be easily transferred to govern procedures in arbitration. As to the schedule for discovery, arbitration has the advantage of being an efficient and cost-effective manner to handle disputes and while a scheduling order will necessarily need to be issued by an arbitrator, that procedural necessity does not rise to prejudice Brock.

Third, Brock argues that its damages continue to increase because Apache still has confidential information and continues to use it. Brock does not show how this relates to prejudice resulting from delaying the demand for arbitration. Under the JAMS Employment Arbitration Rules and Procedures, an arbitrator—like this Court—can grant interim injunctive relief if the arbitrator deems it necessary. JAMS, *Employment Arbitration Rules & Procedures*, Rule 24 – Awards, https://www.jamsadr.com/rules-employment-arbitration/english#twentyfour (last visited April 13, 2020).  Further, any ongoing damages can be included in an arbitration award. This argument does not convince the Court how Brock has been prejudiced by the delay.

Last, Brock argues that it will face increased litigation costs by having to now arbitrate. Given that Brock agreed to arbitrate disputes such as the present one, and instead filed suit in this Court, thereby incurring the normal costs of litigation, this argument is not persuasive. Further, to the extent that attorney's fees may be awarded to the prevailing party, Rule 24 of the JAMS Employment Arbitration Rules & Procedures states:

> The Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) if provided by the Parties' Agreement or allowed by applicable law. When the Arbitrator is authorized to award attorneys' fees and must determine the reasonable amount of such fees, he or she may consider whether the failure of a Party to cooperate reasonably in the discovery process and/or comply with the Arbitrator's discovery orders caused delay to the proceeding or additional costs to the other Parties.

JAMS, *Employment Arbitration Rules & Procedures*, Rule 24 – Awards, https://www.jamsadr.com/rules-employment-arbitration/english#twentyfour (last visited April 13, 2020). Therefore, to the extent Brock is harmed by increasing costs and prevails at arbitration, the arbitration award can allocate attorneys' fees to compensate Brock. This argument does not convince the Court that Brock has been prejudiced by the delay.

The Fifth Circuit instructs courts to consider three factors in determining if prejudice has occurred, "(1) whether discovery occurred relating to arbitrable claims; (2) the time and expense incurred in defending against a motion for summary judgment; and (3) a party's failure to timely assert its right to arbitrate." *Petroleum Pipe Americas Corp. v. Jindal Saw, Ltd.*, 575 F.3d 476, 480 (5th Cir. 2009).

Under the first factor, discovery has occurred relating to arbitrable claims. However Brock has not provided evidence that the discovery will not be useful in arbitration or would not have occurred in arbitration, given the broad scope of the Dispute Resolution Policy and the fact that the Dispute Resolution Policy does not limit the scope of discovery. The Dispute Resolution Policy states "In arbitration, the parties will have the right to conduct civil discovery and bring motions, as provided by the Arbitration Rules." (Doc. 267-1 at 62) Under the JAMS Employment Arbitration Rules & Procedures, parties are required to exchange documents, allowed to take at least one deposition of opposing witnesses, and can submit disputes regarding discovery to an arbitrator. JAMS, *Employment Arbitration Rules & Procedures*, Rule 17 – Exchange of Information, https://www.jamsadr.com/rules-employment-

arbitration/english#seventeen (last visited April 13, 2020). Brock has not provided evidence that the discovery conducted thus far in this case is not substantially similar to that available in arbitration. Therefore, this factor is neutral as to whether Brock has been prejudiced.

The second factor involves the time and expense incurred in defending against a motion for summary judgment. Brock has not provided any evidence regarding defending against summary judgment. Given that Brock has filed leave to bring a fourth amended complaint and this case has not yet progressed to the point where summary judgment is appropriate, this factor weighs against finding that Brock has been prejudiced.

The third factor, a party's failure to timely assert its right to arbitrate, again relates to whether Individual Defendants and Apache knew that there was a right to arbitrate. The Court concludes that they did not know until the Dispute Resolution Policy was disclosed in the Rule 37.1 conference, and so Defendants acted timely. Thus, this factor weighs against finding prejudice.

In conclusion, Brock has not provided sufficient evidence to show that it was prejudiced by Individual Defendants and Apaches' delay and actions in litigating this case before moving to compel arbitration.

c.   *Whether the Court should allow non-signatories (Apache, Ms. Bauer, Mr. Rogers) to compel Brock, a signatory to the Dispute Resolution Policy, to arbitrate.*

As set forth by the Fifth Circuit, a non-signatory can compel a signatory to an arbitration agreement to arbitrate a dispute "when the signatory raises allegations of substantially interdependent and concerted misconduct by both the non-signatory and one or more signatories to the contract." *Brown*, 462 F.3d at 398 (citing *Grigson*, 210 F.3d at 527). Key to applying the second test is "the fact that none of the claims against the non-signatories c[an] be considered without analyzing the "tortious acts" of the signatories." *Palmer Ventures*, 254 F. App'x at 432.

It is not clear from the record if Ms. Bauer and Mr. Rogers signed the Dispute Resolution Policy. However, because Brock alleges concerted misconduct against Ms. Bauer, Mr. Rogers and Apache, equitable estoppel applies to compel Brock to also arbitrate its disputes with these non-signatories. Brock alleges that Ms. Bauer and Mr. Rogers acted in concert with the other Individual Defendants to misappropriate its trade secrets when they resigned from Brock and began working at Apache. Brock also alleges that Apache knew that Individual Defendants acquired the misappropriated trade secrets by improper means and continues to use the confidential and proprietary information to benefit Apache. (Doc. 192 at ¶¶ 152-154.) As such, Apache allegedly "aided, abetted, and encouraged the unlawful competition with the specific intent of harming Brock and depriving Brock of its customers and competitive advantage." (Doc. 192 at ¶ 153.) "Thus, Apache conspired with Employee Defendants . . . to unlawfully compete against Brock and transfer Brock's business to Apache." (*Id.* at ¶ 154.) It is difficult to see how the claims against Ms. Bauer, Mr. Rogers, and Apache could be considered without analyzing the claims against Mr. Rogillio, Ms. Redd, or Mr. Gatlin. Allowing the claims against the non-signatories to go forward would therefore defeat the purpose of arbitration. As such, applying equitable estoppel to compel Brock to also arbitrate its claims against Apache, Ms. Bauer and Mr. Rogers is appropriate.

In addition, Brock's Dispute Resolution Policy includes language that the Dispute Resolution Policy is meant to benefit third-party non-signatories such as customers of Brock in any dispute related to Brock's employees. As Apache points out, Apache has been a customer of Brock and has leased scaffolding and other equipment from Brock in the past. (Doc. 263 at 8.) Brock expressly agrees in the Dispute Resolution Policy to arbitrate disputes with non-

signatories, such as Apache, and applying equitable estoppel in this case reflects the intent of the parties to the Dispute Resolution Policy.

Therefore, in conclusion, the Court finds that under the prevailing law and the facts of the case, the entire matter—including the disputes with nonsignatory defendants, Ms. Bauer, Mr. Rogers, and Apache—is appropriate for arbitration. Given the Court's conclusion that arbitration will be compelled, it is not necessary to determine whether it is appropriate to consider the issue of a stay as to certain parties.

## V.    CONCLUSION

Accordingly,

**IT IS ORDERED** that *Kristy Bauer's Motion to Compel Arbitration and to Dismiss* (Doc. 219); *Rhonda Redd's Motion to Compel Arbitration and to Dismiss* (Doc. 220); *Ken Rodgers' Motion to Compel Arbitration and to Dismiss* (Doc. 221); *Gene Gatlin's Motion to Compel Arbitration and to Dismiss* (Doc. 223); *Ricky Rogillio's Motion to Compel Arbitration and to Dismiss* (Doc. 224); and *Apache's Motion to Compel Arbitration and to Dismiss, or Alternatively, Motion to Stay Proceedings Pending Completion of Arbitration* (Doc. 249) are **GRANTED in part and DENIED in part;**

**IT IS FURTHER ORDERED** that the parties in this case, including the nonsignatory defendants, shall arbitrate this dispute under the terms of the Dispute Resolution Policy;

**IT IS FURTHER ORDERED** that all otherwise pending motions in this case are denied without prejudice as moot;

**IT IS FURTHER ORDERED** that this case is stayed and administratively closed, pending the outcome of arbitration.

Signed in Baton Rouge, Louisiana, on <u>May 18, 2020</u>.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**